C. Tom Arkoosh, ISB No. 2253
Arkoosh Law Offices, PLLC
802 West Bannock St., Suite 900
Boise, Idaho 83702
Telephone: (208) 343-5105
Facsimile:  (208) 343-5456
Email:  tom.arkoosh@arkoosh.com

Skip Sperry, ISB No. 4865
Sperry Law Office, PLLC
802 West Bannock St., Suite 900
Boise, Idaho 83702
Telephone: (208) 861-5150
Email: skip@sperry.law

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| PASCALE L. SNODGRASS<br><br>        Plaintiff,<br><br>v.<br><br>SAINT ALPHONSUS REGIONAL MEDICAL CENTER, INC. and TRINITY HEALTH CORPORATION<br><br>        Defendants. | Case No:<br><br>**COMPLAINT**<br><br>**FILED UNDER SEAL**<br><br>**JURY TRIAL DEMANDED** |

## I.      NATURE OF THE ACTION, JURISDICTION, AND VENUE

1.      Qui Tam Relator Pascale L. Snodgrass ("Ms. Snodgrass") brings this action on her own behalf and on behalf of the United States of America to recover civil damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA"), against Defendants, Saint Alphonsus Regional Medical Center, Inc. and Trinity Health Corporation.

COMPLAINT - 1

2.      Ms. Snodgrass is and was, at all times relevant herein, a resident of Ada County, Idaho and was employed by Defendant in Ada County, Idaho.

3.      Defendant Saint Alphonsus Regional Medical Center, Inc. ("Defendant") is a corporation organized and existing under the laws of the state of Idaho with its principal office and place of business at 1055 North Curtis Road, Boise, Ada County, Idaho.  It is a member of Trinity Health Corporation ("Trinity").  Collectively, Defendant and Trinity are referred to in this Complaint as the "Defendants."

4.      Defendant Trinity is a nonprofit corporation organized and existing under the laws of the state of Indiana with its principal office and place of business at 20555 Victor Parkway, Livonia, Michigan 48152.  Directly or through wholly owned organizations, Trinity owns and operates Defendant, 92 other hospitals, and 120 continuing care facilities in 22 states.

5.      Subject matter jurisdiction is conferred by 31 U.S.C. § 3732(a) and 28 U.S.C. § 1331.

6.      This Court has personal jurisdiction over Defendant because it is located within the District of Idaho and acts as a provider of health care services and products to federal health care program beneficiaries, including Medicare and Medicaid beneficiaries, within the District of Idaho.  Defendant regularly performs healthcare services and submits claims for payment to federal health care programs, including, but not limited to, Medicare and Medicaid, and accordingly is subject to the jurisdiction of this Court.

7.      This Court has personal jurisdiction over Trinity because it owns, controls, and participates in the provision of healthcare services with Defendant within the District of Idaho.  It also provides federal regulatory compliance auditing and oversight to Defendant, which is part of

the basis of this Complaint, and engaged in wrongdoing in this District.  Further, on October 28, 2008, Trinity obtained from the Idaho Secretary of State a Certificate of Authority to transact business in Idaho.

8.      Venue is appropriate under 28 U.S.C. § 1391(b), (c), and 31 U.S.C. § 3732(a) because Defendants transact business within this district and the facts forming the basis of this Complaint occurred within this district.

9.      The facts and circumstances of the Defendants' violations of the FCA have not been publicly disclosed in a criminal, civil or administrative hearing, nor in any congressional, administrative, or General Accounting Office or Auditor General's report, hearing, audit, or investigation, or in the news media.

10.     Ms. Snodgrass is the original source of the information upon which this Complaint is based, as that phrase is used in the FCA, and she provided disclosures of the allegations of this Complaint to the United States prior to filing.

## II.      GENERAL ALLEGATIONS

11.     Plaintiff reiterates and incorporates paragraphs 1 through 10 herein by reference.

12.     As part of its health care operations, Defendant operates a Transitional Rehabilitation Unit ("Rehabilitation Department"), classified as a nursing home and which is Medicare Certified, ID# 135119.

13.     As a Medicare provider, Defendant was required to and did attest that it is and was aware of and abides by all applicable statutes, regulations and Medicare program instructions. Providers such as Defendants are under a legal duty to familiarize themselves with the requirements for Medicare reimbursement, agree to abide by the rules governing reimbursement,

and take full responsibility for the accuracy of all claims submitted.

14.     Ms. Snodgrass began employment with Defendant in or around July 1996 as a floor nurse on the night shift in Defendant's Rehabilitation Department.

15.     Her duties as a floor nurse included direct patient care, assessing patients, following physician orders, providing medications, documentation, and communication with treatment teams and physicians.

16.     About three months after beginning her employment, Defendant promoted Ms. Snodgrass to the position of Charge Nurse on the night shift.

17.     In addition to the duties previously described, her duties as a Charge Nurse included providing supervisory oversight to nurses and CNAs working on the shift, managing staffing, managing changes in patient conditions, and contacting physicians and patient family members.

18.     In or about the fall of 1997, Ms. Snodgrass was promoted to the position of Stroke Team Leader.

19.     As Stroke Team Leader, her duties changed to include, managing all patients admitted with a stroke diagnosis according to Medicare requirements, attending and participating in weekly interdisciplinary team meetings, care coordination for the stroke patient population, patient and family education, discharge planning, and all the duties of a floor nurse for the stroke patient population.

20.     In or about June 1999, Defendant promoted Ms. Snodgrass to the position of Unit Coordinator.

21.     As Unit Coordinator, Ms. Snodgrass' duties included assisting the Unit Manager, supervising nurses and CNAs, hiring, performance management, scheduling, and other day to day

operations of the unit.

22.     In or around October 2010, after being acquired by Trinity, Defendant changed its admissions protocol to an electronic records format.

23.     To be eligible for Medicare reimbursement, the Social Security Act and associated regulations ("Certification Law") require that a physician certify that a patient admitted to a Skilled Nursing Facility ("SNF") meets the criteria for skilled nursing care.  Patients must need 24-hour skilled nursing care with physician oversight to be eligible for admission to a SNF.

24.     This initial certification requires the physician to describe the reasons for the need for posthospital SNF care, the estimated time the individual will need to remain in the SNF, plans for home care, if any, and, if appropriate, the fact that continued services are needed for a condition that arose after admission to the SNF and while the individual was still under treatment for the condition for which he or she had received inpatient hospital services.

25.     Additionally, Certification Law requires recertification of the above factors if the patient stays fourteen or more days.  The first recertification must be completed on or before the 14th day, the second recertification must be completed on or before the 30th day, and subsequent recertifications must be completed every additional 30 days of a patient's stay in the SNF.

26.     Compliance with the Certification Law is an express precondition for Medicare reimbursement.

27.     Section 42 U.S.C. 1395f, in relevant part, states:

(a) . . . payment for services furnished an individual may be made only to providers of services which are eligible therefor under section 1866 and only if—
. . . .

(2) a physician, . . . certifies (and recertifies, where such services are furnished over a period of time, in such cases, with such frequency, and accompanied by such

supporting material, appropriate to the case involved, as may be provided by regulations . . . <u>that</u>—

. . . .

(B) in the case of post-hospital extended care services, <u>such services are or were required to be given because the individual needs or needed on a daily basis skilled nursing care</u> (provided directly by or requiring the supervision of skilled nursing personnel) <u>or other skilled rehabilitation services</u>, which as a practical matter can only be provided in a skilled nursing facility on an inpatient basis.

[Emphasis added.]

28.     Section 42 C.F.R. 424.10, in relevant part, states:

(a) *Purpose*. The physician has a major role in determining utilization of health services furnished by providers. The physician decides upon admissions, orders tests, drugs, and treatments, and determines the length of stay. Accordingly, sections 1814(a)(2) and 1835(a)(2) of the Act establish <u>as a condition for Medicare payment</u> that a physician certify the necessity of the services and, in some instances, recertify the continued need for those services.

[Emphasis added.]

29.     Section 42 C.F.R. 424.11, in relevant part, states:

General procedures.

(a)  Responsibility of the provider. The provider must—

(1)  Obtain the required certification and recertification statements;

(2)  Keep them on file for verification by the intermediary, if necessary; and

(3)  <u>Certify, on the appropriate billing form, that the statements have been obtained and are on file</u>.

[Emphasis added.]

30.     Section 42 C.F.R. 424.20, in relevant part, states:

<u>Medicare</u> Part A <u>pays for posthospital SNF care</u> furnished by an SNF . . . <u>only if the certification and recertification</u> for services <u>are consistent with the content of paragraph (a) or (c)</u> of this section, as appropriate.

(a) Content of certification -

(1) General requirements. <u>Posthospital SNF care</u> is or was <u>required</u> <u>because</u> –

(i) The individual needs or needed on a daily basis skilled nursing care . . . or other

skilled rehabilitation services that, as a practical matter, can only be provided in an SNF . . . on an inpatient basis, and the SNF care is or was needed for a condition for which the individual received inpatient care in a participating hospital or a qualified hospital . . . ;

. . . .

(c) Content of recertifications.

(1) The reasons for the continued need for posthospital SNF care;

(2) The estimated time the individual will need to remain in the SNF;

(3) Plans for home care, if any; and

(4) If appropriate, the fact that continued services are needed for a condition that arose after admission to the SNF and while the individual was still under treatment for the condition for which he or she had received inpatient hospital services.

31.     In 2011, Cathy Niland ("Niland"), Trinity's financial and regulatory compliance auditor completed an audit and stated that Defendant was completely compliant with Certification Law for all SNF charts she reviewed.

32.     In or around December 2010, Defendant promoted Ms. Snodgrass to the position of Rehabilitation Department Interim Nurse Manager and in July 2011 promoted her to the Rehabilitation Department Nurse Manager in a regular capacity.

33.     Her duties as Nurse Manager included managing daily staffing, working with the patient admissions team, managing the department's budget, hiring, termination, employee performance management, strategic planning, unit performance improvement, working with physicians, ensuring regulatory compliance for both sub-acute and rehabilitation services, review of patients who did not meet admission criteria, and participating in interdisciplinary committees.

34.     Initially, Ms. Snodgrass reported to Sherry Parks, Defendant's Chief Nursing Officer ("Parks").

35.     Beginning in or around January 2013, Ms. Snodgrass began reporting to Tonya

Kardas, Defendant's Director of Acute Care Nursing ("Kardas").  Kardas, in turn, reported to Parks.

36.     From January 2013 until September 2013, Ms. Snodgrass filled in as Interim Director of the Rehabilitation Department and also continued her duties as Nurse Manager.

37.     In addition to her Nurse Manager duties, as Interim Director, Ms. Snodgrass' duties included dealing with many Medicare regulatory requirements that were not being met in the occupational, speech, and physical therapy departments, and working with physicians who were not meeting those Medicare regulatory requirements that needed to be met to qualify for Medicare reimbursement.

38.     In September 2015, Daniel Mata ("Mata") resigned from his position with Defendant.  Prior to his resignation, Mata was Defendant's on-site Nursing Home Administrator ("NHA") and Rehabilitation Department Director.  Mata held the NHA license for Defendant.  As a result of Mata's departure, Defendant, in September 2015, again asked Ms. Snodgrass to fill in as Interim Director of the Rehabilitation Division, but Defendant was left without an NHA with appropriate licensure.

39.     During her second period as Interim Director, Ms. Snodgrass was additionally responsible for reviewing potential and current admissions for compliance with Medicare admission criteria with the admission coordinators and physicians, auditing charts for proper therapy documentation, terminating noncompliant therapists and their supervisor, hiring and training the new therapy supervisor, and helping to coordinate Niland's return to audit workflow that impacted regulatory compliance.

40.     Pursuant to federal and state law, Defendant was required to employ an NHA with

appropriate licensure to comply with Medicare law.  An NHA is an express requirement to qualify for Medicare reimbursement ("NHA Law").

41.     Centers for Medicare & Medicaid Services guidance states that "Skilled nursing facilities (SNFs) and nursing facilities (NFs) are required to be in compliance with the requirements in 42 CFR Part 483, Subpart B, to receive payment under the Medicare or Medicaid programs." https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/CertificationandComplianc/NHs.html.

42.     Section 42 C.F.R. 483.1(b) states, in relevant part:

(b) Scope. The provisions of this part contain the requirements that an institution must meet in order to qualify to participate as a SNF in the Medicare program.

43.     Section 42 C.F.R. 483.5(a) states, in relevant part:

(a) **Facility defined.** For purposes of this subpart, facility means a skilled nursing facility (SNF) that meets the requirements of sections 1819(a), (b), (c), and (d) of the Act.

44.     Section 1819(d)(2)(A) of the Social Security Act states, in relevant part:

(A) Licensing.—A skilled nursing facility must be licensed under applicable State and local law.

45.     Idaho Code §54-1602 states, in relevant part:

SUPERVISION BY LICENSED ADMINISTRATOR REQUIRED -- EXCEPTION FOR ADMINISTRATOR DESIGNEE -- PRACTICE BY UNLICENSED PERSON PROHIBITED. No nursing home in the state shall be operated unless it is under the supervision of an administrator who holds a currently valid nursing home administrator's license issued pursuant to this act, except that after an administrator's position becomes vacant, a nursing home may operate under a responsible person authorized by signed agreement to act as an administrator designee. The administrator designee shall be qualified by documented experience to assume delegated duties, and shall not act for more than eight (8) continuous weeks unless an exception is granted by the board. An Idaho licensed administrator shall enter into an agreement, which shall be submitted to the board, to consult with the administrator designee. No person shall practice or offer to practice nursing home administration in this state or use any title, sign, card, or device to indicate

that he is a nursing home administrator unless such person shall have been duly licensed as a nursing home administrator as required by this act.

[Emphasis added.]

46.     At the beginning of October 2015, as a stop-gap measure, Defendant applied to the Idaho State Board of Examiners of Nursing Home Administrators Bureau of Occupational Licenses for permission for Ms. Snodgrass to work as the NHA Designee, using Harold "Ray" Gibbons' ("Gibbons") license on an interim basis.  Ms. Snodgrass filled out her portion of the application, Gibbons filled out his portion of the application, and Kardas took the completed application to obtain payment of the application fee and file it with the Bureau of Occupational Licenses.

47.     The application form specifically indicated that the Designee period was "not to exceed 8 weeks under the provisions of Title 54, Chapter 16, Idaho Code as amended."

48.     As alleged in paragraph 38, Idaho Code Section 54-1602 limits the length of time an off-site administrator's on-site designee can operate as a designee to eight (8) weeks unless an exception is granted by the board.

49.     Gibbons was located offsite in Baker City, Oregon and was acting as the President of Saint Alphonsus in Baker City.

50.     As early as October 5, 2015, Ms. Snodgrass raised the issue of the temporary nature of a designee status under Gibbons' Nursing Home Administrator license.  This topic was discussed in a meeting Ms. Snodgrass had with Kardas, Jedd Smith ("Smith"), and Kelly Dwello ("Dwello").  Kardas stated that per Gibbons, there was no time limit for the interim designation. Dwello and Ms. Snodgrass insisted that there was a limit.

51.     On October 14, 2015, the Idaho Bureau of Occupational Licenses ("IBOL") issued

a temporary authorization that allowed Ms. Snodgrass to work as a designee under the license and supervision of Gibbons.

52.     The interim authorization expressly provided that the interim period ended on December 14, 2015, after which Defendant would need to have a permanent solution in place. "This administrator designee agreement is <u>not to exceed eight (8) continuous weeks</u>. The expiration date of this agreement is December 14, 2015." [Emphasis added.]

53.     As of December 14, 2015, Defendant did not have an NHA with appropriate licensure on staff, in violation of NHA Law.  This failure disqualified the SNF from claiming or receiving any Medicare reimbursement for its services until a licensed NHA was put in place or an exception was applied for through the IBOL.

54.     From December 10, 2015 through August 29, 2016, Ms. Snodgrass brought this potential and actual noncompliance up with her supervisor and other executives on several occasions, explaining each time that Defendant was out of compliance and its Medicare reimbursement requests were improper as a result.

55.     On December 10, 2015, Ms. Snodgrass met with Smith and Kardas.  During that meeting Ms. Snodgrass reminded them that the interim designee period was going to expire on December 14, 2015, and that they needed to find a permanent solution.  Kardas said that despite her belief that there was no time limit for the interim designation, she would look into an extension of the interim ability to work under Gibbons' license.  According to IBOL, Defendant never formally applied for the extension.

56.     On January 21, 2016, Ms. Snodgrass met with Odette C. Bolano, Defendant's President ("Bolano"), Jennifer Uruchurtu ("Uruchurtu"), Susie Shumacher, Defendant's Financial

and Regulatory Compliance Manager ("Shumacher"), Parks, and Smith to discuss Ms. Snodgrass'
compliance concerns.  They met in Bolano's office, and Ms. Snodgrass repeated, among other
concerns, that Defendant did not have a current NHA, which was a requirement for Medicare
reimbursement.  Bolano ended the meeting by telling the participants that she would be looking
into all of the stated concerns.

57.     On or about February 4, 2016, Bolano called a meeting which included Parks,
Kardas, Smith, Uruchurtu, Schumacher, and Ms. Snodgrass.  The meeting was led by Bolano in
the Coughlin #3 conference room.  Bolano informed the team that Niland from Trinity's home
office would complete an onsite audit to identify or confirm areas of risk or concern.

58.     Niland was on site from February 22, 2016 through February 26, 2016, but neither
initial certifications for SNF nor on-site Nursing Home Administrator licensure were addressed in
her audit.  Niland informed Ms. Snodgrass that she found no regulatory violations and only had
recommendations for operational changes that required action from Kardas' level or higher.

59.     After three years of study, in March, 2016, Ms. Snodgrass completed two master's
degrees in Nursing and Health Administration.  It had been Defendant's standing policy that if
employees obtained a master's degree in an area related to their positions, they would receive an
increase in pay.  Parks had encouraged Ms. Snodgrass to pursue her master's degrees by invoking
the long-standing policy.  Ms. Snodgrass told Kardas that she had graduated, and Kardas told her
to bring her diplomas to her so that Ms. Snodgrass could receiver her pay increase.

60.     In May, 2016, Ms. Snodgrass delivered her diplomas to Kardas.  After receiving
two paychecks that did not reflect her pay increase, Ms. Snodgrass spoke to Kardas about it.
Kardas told Ms. Snodgrass that she would look into it.  Between one and two weeks later, Kardas

COMPLAINT - 12

told Ms. Snodgrass that there was a new policy and Defendant no longer provided pay increases for master's degrees.

61.     As a result of Ms. Snodgrass' duties as Nurse Manager and Interim Director, Ms. Snodgrass had the opportunity to observe many of the admission certifications and practices for Medicare patients.

62.     In or around June 2016, in connection with Ms. Snodgrass' compliance auditing and at the same time she was seeking a pay increase associated with her obtaining two masters degrees, Defendant's billing department contacted her, requesting initial certifications for two or three patients.  Ms. Snodgrass could not find the requested initial certifications in the patients' charts.  She spoke with JoAnna Dibben, Defendant's Medicare nurse ("Dibben") about the missing certifications. Dibben explained that the admission order ("admit to SNF") was being used as the initial certification and that Defendant had been following this procedure since October 2010 with the change to the electronic records format.

63.     Ms. Snodgrass again reviewed the patient charts to determine whether the admit to SNF was in the charts.  She discovered that the admit order to SNF did not include any information required for admission and reimbursement under the Medicare regulations.  It simply stated that the patient met the requirement of 42 C.F.R 412.3.  Ms. Snodgrass looked up the cited regulation and found that it was not even the correct regulation for admission to SNFs.  It related specifically to the certification criteria for admission into an acute care hospital.  Even had the admit order to SNF contained the correct regulation, simply stating that the admission complied with the regulation would not have been in compliance with Certification Law, a precondition for Medicare claims for reimbursement.

64.     Following this discovery, Ms. Snodgrass reported the noncompliance to Schumacher.  She also reported the noncompliance to Kardas.  Shumacher and Kardas requested Ms. Snodgrass to fix the noncompliance.  Ms. Snodgrass spoke to Niland to ensure that she understood the requirements fully.  Niland provided Ms. Snodgrass with an example certification form.  Ms. Snodgrass reworked Defendant's current recertification form, which was compliant, for use as an initial certification form and sent the form through the approval process.  From that point forward, Defendant used the paper certification and recertification forms to admit patients into the SNF.

65.     Ms. Snodgrass educated the Medicare nurses, Dibben, Megan Reichle ("Reichle"), and Donna Dvorak ("Dvorak"), on the new form.  During this education, Ms. Snodgrass discovered that Dr. Michael McMartin, Defendant's Medical Director, was pre-signing stacks of recertification forms for the Medicare nurses to fill out as they pleased.  When questioned, the nurses told Ms. Snodgrass that this practice had been followed since October 2010.  She also discovered that Dr. McMartin was completing these pre-signed recertification forms for all patients, regardless of whether he was the patients' physician in direct violation of Certification Law.  The result was that at the time the recertifications were completed by the Medicare nurses, Dr. McMartin had no knowledge of the patients' condition, current status, and continuing eligibility for SNF care.

66.     Ms. Snodgrass required the nurses to recertify all current SNF patients with the proper physician oversight, signature, and process.

67.     At least as recently as August 5, 2016, Defendant has failed to identify the wrongful certifications to the appropriate governmental authorities and have retained Medicare

reimbursements that it would not otherwise be eligible for under Certification Law.

68.    On July 5, 2016, Sam Burbank ("Burbank"), from the Idaho Department of Health & Welfare arrived at the premises to conduct an unannounced fire and life safety inspection. Burbank asked Ms. Snodgrass if she was the NHA, and knowing that the interim designee period had expired on December 14, 2015, she answered that she was not.

69.    On July 6, 2016, Bolano, during a daily safety huddle, addressed Ms. Snodgrass conveying her dissatisfaction with Ms. Snodgrass' failure to notify Bolano about the Burbank inspection and her failure to announce the inspection over the hospital's loudspeaker system.  Ms. Snodgrass explained that she was unaware that Bolano wanted to be notified and that the Idaho Department of Health and Welfare does not check in and does not allow a public announcement of its presence for an audit.

70.    On July 11, 2016, Kardas emailed Ms. Snodgrass regarding her failure to identify herself to Burbank as Defendant's NHA:

> We have yet to work through the logistics as far as ongoing NHA coverage so if the State shows up for their annual survey (which you know they do, unannounced), please let them know you are continuing to function as the designee under Ray's licensure at this time. Please do not say anything about your plans to transition out of this capacity should they ask about it.
>
> We are working to arrange a phone conference with the State next week between Ray, Odette, Sherry, and me to update them on our status and do not want to cause them concern prior to that conversation.
>
> Thank you very much for your discretion.

71.    On or about July 25, 2016, Ms. Snodgrass received her annual performance appraisal from her supervisor, Kardas.

72.    As was the norm during Ms. Snodgrass' twenty-year career with Defendant, the

COMPLAINT - 15

performance appraisal reflected scores of four out of a possible four points for nearly every individual performance category.

73.     After a series of state official inquiries into other matters, on or about July 23, 2016, while Ms. Snodgrass was on vacation, Debbie Ransom, Director of the Idaho Department of Health and Welfare, made an inquiry via email about the identity of Defendant's NHA and that person's license number.

74.     Ms. Snodgrass was very worried about making a response to this inquiry because Defendant had not had a licensed NHA since December 14, 2015.

75.     On July 26, 2016, Ms. Snodgrass sent the inquiry to Kardas, Gibbons, Parks and Bolano, explaining her discomfort in responding to the inquiry because Defendant did not have an on-site NHA, had not since December 14, 2015, and again iterated her many attempts to resolve that noncompliance.  This was the first time Ms. Snodgrass put her concerns into writing.

76.     In her July 26, 2016 correspondence with Gibbons, Kardas, Parks, and Bolano about Defendant's failure to have a licensed NHA and the possible consequences, Gibbons responded by continuing to maintain that there was no eight-week limitation to the IBOL's temporary authorization.  Kardas, likewise, expressed her directive that Ms. Snodgrass continue to function in the role of the NHA Designee.  Kardas continued the correspondence by asking what Ms. Snodgrass' response would be if the State showed up tomorrow and asked who the on-site NHA designee was.  Her correspondence recognized that Defendant could not "keep the TRU [SNF] unit operational without the NHA designee in place."

77.     On August 1, 2016, Gibbons corresponded with Debbie Ransom at the Department of Health and Welfare, stating that he was Defendant's NHA.

78.     Also on August 1, 2016, one week after her initial performance appraisal and only five days after Ms. Snodgrass forwarded Ransom's email request for the identity of Defendant's NHA, Kardas explained to Ms. Snodgrass that she needed to reevaluate Ms. Snodgrass' annual performance and redo the appraisal

79.     On August 4, 2016, Shumacher called a meeting in the Nursing Administration Conference Room.  Attendees were Kardas and Ms. Snodgrass.  Shumacher wanted an update on where Ms. Snodgrass was in the process of fixing Defendant's initial certification procedure and form.  Ms. Snodgrass informed them that the process was fixed and that the new paper form was in place.  Shumacher asked Ms. Snodgrass at what point the process was changed because in Niland's 2011 audit, there had been no compliance issues raised.  Ms. Snodgrass explained that the procedure and forms had not changed since October 2010.  Shumacher called Niland and put her on the speakerphone.  Shumacher asked Niland how Defendant could be in total compliance in 2011 and out of compliance in 2016 when the process and forms had never changed.  Niland insisted that the form must have been different in 2011.  Shumacher requested Niland to send her all audit paperwork and charts from the 2011 audit.  Niland agreed.  During this meeting Shumacher asked Ms. Snodgrass how far back Defendant's risk went for the initial certification noncompliance.  Ms. Snodgrass replied that it went back to October 2010.  Shumacher questioned whether Defendant should self-disclose the noncompliance to Medicare authorities or to keep quiet and see what happens.  Shumacher told the attendees that she would schedule a meeting the next day with Dibben and Reichle to review Niland's 2011 audit.

80.     On August 5, 2016, Ms. Snodgrass met with Reichle and Dibben, who reported to Ms. Snodgrass, and inquired about the meeting Shumacher.  They told Ms. Snodgrass that there

were no initial certifications associated with the claims audited by Niland in 2011 and the same uncompliant forms had been used.

81.     Ms. Snodgrass' performance re-evaluation was completed on or about August 5, 2016.  The re-evaluation resulted in a performance appraisal that lowered Ms. Snodgrass from a four to a three in six areas of performance and from a four to a two in two other areas of performance—by far the worst evaluation in Ms. Snodgrass' twenty-year career with Defendant.

82.     Ms. Snodgrass had received no prior notice, written or verbal, of any deficiencies in her performance prior to her initial evaluation or her re-evaluation.

83.     At least as of August 5, 2016, Defendant had not self-disclosed any area of noncompliance of Certification Law or NHA Law to any related governmental agency.

## III.     COUNT I (ALL DEFENDANTS) – VIOLATION OF THE FALSE CLAIMS ACT (CERTIFICATION & RECERTIFICATION)

84.     Plaintiff reiterates and incorporates paragraphs 1 through 83 herein by reference.

85.     Defendant presented or caused to be presented to an agent of the United States ("Government") thousands of claims for payment from October 2010 through at least August 5, 2016.

86.     In her role as both the Nurse Manager and the Interim Director, Ms. Snodgrass was aware of and had personal knowledgeable about the revenue and Government claim processes. The Medicare nurses, Dibben, Reichle, and Dvorak, under Ms. Snodgrass' supervision, completed the paperwork required by Medicare known as the Minimum Data Set ("MDS").  As part of this process the billing department would complete the coding portion of the claims process and send those back to the Medicare nurses to include with their paperwork to Medicare. Once the Medicare nurses completed the Medicare paperwork within the required timeframes they would send it to

an employee named Robert George who would encode it for export to Medicare. He received a file back from Medicare and this was sent from Robert George to the Medicare nurses.

87.     Ms. Snodgrass worked with Katrina Fritz from the Charge Capture and Finance team to update the policy on this claims process while in the Interim Director role.  She published a training manual for all new hires that included this information in it so that they understand their role in the charting and documentation procedures and the mandatory timeframes.  Ms. Snodgrass received daily reports that informed her of the dollar amounts of outstanding claims indicating which Medicare accounts had not been submitted.  Ms. Snodgrass worked with the Medicare nurses to find out about delays.  Additionally, the Medicare nurses informed Ms. Snodgrass when another department was impacting their ability to complete the process for billing in a timely manner.

88.     Ms. Snodgrass had meetings with the financial and revenue regulatory team (Kardas, Schumacher, Lynae Nielson [Rehab Department Regulatory and Compliance Manager] and Zach Welch [Western Regional Director of Revenue] due to concerns that the Medicare nurses could not always keep up with the workload.  Ms. Snodgrass voiced concerns that the computer systems did not support their work. This Medicare paperwork and the submission of claims was discussed at length.

89.     Ms. Snodgrass received inquiries from billing and finance when they received denials from Medicare requesting information from charts for missing or potential missing documentation to substantiate claims. She also completed audits and supplied material to validate claims, if available.

90.     As alleged in paragraph 13, the claims were false or fraudulent in that Defendant

expressly certified that it was aware of and abided by all applicable Medicare statutes, regulations, and program instructions.

91.     As alleged above in paragraphs 62-66, the claims were false or fraudulent in that they impliedly certified compliance with Certification Law that was not actually followed.

92.     The claims were materially false because the Certification Law expressly preconditioned payment for the claims on Defendant's compliance with the Certification Law as alleged in paragraphs 23-30 of this Complaint.  Because of this precondition to payment, the Government would have refused payment of Defendant's noncompliant claims.

93.     Defendant knew the claims were false or fraudulent.  It acted with deliberate ignorance of the truth or falsity of the information provided or acted with reckless disregard of the truth or falsity of the information provided to the Government.

94.     Prior to October 2010, Defendant knew and followed the correct procedure for admissions and for reimbursement under the Certification Law.  The change in Electronic Medical Record ("EMR") system changed the process but not Defendant's knowledge of Certification Law. The Defendant chose to apply the regulations for admission to an acute hospital as a blanket statement for all patients. They knew this was fraudulent.

95.     As described in paragraphs 31, 57, and 58 of this Complaint, Niland completed regulatory audits of Defendant's admissions and Government billing procedures; however, she failed to even conduct enough due diligence to determine that the form cited an inaccurate regulation and that the correct regulation was not being followed.  She concluded that all initial certifications were one-hundred percent compliant, yet there were no initial certifications in the charts as required by the Certification Law.  As the internal professional for the organization she

knew the law and requirements and acted with deliberate ignorance when she did not identify that this process was in direct opposition to the requirements for receiving Medicare reimbursement.

96.     As alleged in paragraph 65, though recertifications were being completed, the practice was fraudulent as Dr. McMartin's practice from at least October 2010 through July 2016 was to sign blank forms for the Medicare nurses to fill out later for all patients regardless of whether he was the patients' attending physician and without knowing the patients' actual status as of the recertification dates.

97.     As alleged in paragraphs 62-66 and 79, after Ms. Snodgrass brought the noncompliance to Defendant's attention, Shumacher, Defendant's financial and regulatory compliance manager, questioned whether to disclose the years of noncompliance to the Government's or just to wait and see how things went.

98.     At least as of August 5, 2016, Defendant had not disclosed its known noncompliance with the Certification Law that spanned six years.

99.     The Government was damaged as a result of Defendant's fraud.  The Government paid Defendant for false claims which included all noncompliant claims for Medicare reimbursement from Defendant's Rehabilitation Department from October 2010 through at least July 2016.  Because compliance with Certification Law was a precondition to the Government's Medicare reimbursement payments, the Government would not have paid any of the claims had it known that the Certification Law was not being followed.

WHEREFORE, Ms. Snodgrass requests the following relief:

A.     Judgment against Defendants for three times the amount of damages the United States has sustained because of their actions, plus a civil penalty of $11,000 for each violation of

the FCA for false claims presented to the Government prior to August 1, 2016 and a civil penalty of $21,563 for each false claim presented to the Government on and after August 1, 2016.

B.       25% of the proceeds of this action if the United States elects to intervene, and 30% if it does not.

C.       Her attorneys' fees, costs, and expenses.

D.       Such other relief as the Court deems just and appropriate.

E.       Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Ms. Snodgrass hereby demands a trial by jury.

### IV.       COUNT II (DEFENDANT) – VIOLATION OF THE FALSE CLAIMS ACT (NO ON-SITE ADMINISTRATOR WITH APPROPRIATE LICENSURE)

100.    Plaintiff reiterates and incorporates paragraphs 1 through 99 herein by reference.

101.    Defendant presented or caused to be presented to the Government claims for payment from December 15, 2015 through at least August 10, 2016.  As described in paragraph 84 above, in the course of performing her duties, Ms. Snodgrass observed the Government claims process.  Every patient admitted to the SNF from December 15, 2015 to August 10, 2016 was billed for services rendered.  Many of these patients had Medicare coverage paid for by the Government.

102.    The claims were false or fraudulent in that NHA Law requires Defendant to have an NHA with appropriate licensure to qualify for Medicare reimbursement.  Defendant did not have an NHA with appropriate licensure from December 15, 2015 through at least August 10, 2016.  Defendant presented the claims during this time period without disclosing to the Government that it had violated regulations that affected its eligibility for payment, implying that it had complied with the NHA Law's preconditions for payment.

COMPLAINT - 22

103.    As alleged in paragraph 13, the claims were false or fraudulent in that Defendant expressly certified that it was aware of and abided by all applicable Medicare statutes, regulations, and program instructions.

104.    The claims were materially false because the NHA Law expressly preconditions payment for the claims on Defendant's compliance with the NHA Law requirement to have an NHA with appropriate licensure, as alleged in paragraphs 40-45 of this Complaint, the Government would have refused payment of Defendant's noncompliant claims if it had known of Defendant's failure to comply with NHA Law.

105.    Defendant had actual knowledge that the claims were false or fraudulent.  As alleged in paragraphs 47, 48, and 50-58, Defendant was notified on several occasions that it was out of compliance with NHA Law, but did nothing to correct the noncompliance and continued to present its noncompliant claims to the Government for payment.  Further, as alleged in paragraphs 68-70 and 73-77, Defendant intentionally hid this noncompliance from state government officials and the Government and failed to self-disclose its knowledge and its noncompliance.

106.    The Government was damaged as a result of Defendant's fraud.  The Government paid Defendant for false claims which included all noncompliant claims for Medicare reimbursement from Defendant's Rehabilitation Department from December 15, 2015 through at least August 10, 2016.  Because compliance with NHA Law was a precondition to the Government's Medicare reimbursement payments, the Government would not have paid had it known that the NHA Law was not being followed.

WHEREFORE, Ms. Snodgrass requests the following relief:

A.      Judgment against Defendants for three times the amount of damages the United

States has sustained because of their actions, plus a civil penalty of $11,000 for each violation of the FCA for false claims presented to the Government prior to August 1, 2016 and a civil penalty of $21,563 for each false claim presented to the Government on and after August 1, 2016.

B.      25% of the proceeds of this action if the United States elects to intervene, and 30% if it does not.

C.      Her attorneys' fees, costs, and expenses.

D.      Such other relief as the Court deems just and appropriate.

E.      Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Ms. Snodgrass hereby demands a trial by jury.

## V.      COUNT III (DEFENDANT) – RETALIATION

107.    Plaintiff reiterates and incorporates paragraphs 1 through 106 herein by reference.

108.    Ms. Snodgrass engaged in conduct protected under the FCA by protesting Defendant's noncompliance with Certification Law and NHA Law that required compliance as a precondition to submitting claims for Medicare reimbursement.

109.    Ms. Snodgrass' protests were known by Defendant because she brought them to Defendant's attention on a multitude of occasions as alleged in this Complaint.

110.    Defendant subsequently discriminated against Ms. Snodgrass because of her protected activity by failing to provide her a previously promised raise and re-evaluating her performance which resulted in much lower scores than her initial evaluation and as compared to any of her previous performance evaluations throughout her 20-year career with Defendant.

WHEREFORE, Ms. Snodgrass requests the following relief:

A.      Judgment against Defendant directing it to completely expunge Ms. Snodgrass' re-

evaluation from her personnel file and from any of Defendant's records.

       B.     Judgment against Defendant for two times the amount of back pay Ms. Snodgrass was denied by Defendant's failure to provide a promised raise plus interest thereon until paid.

       C.     Her attorneys' fees, costs, and expenses.

       D.     Such other relief as the Court deems just and appropriate.

       E.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Ms. Snodgrass hereby demands a trial by jury.

       DATED November 7, 2016.

ARKOOSH LAW OFFICES, PLLC

/s/ C. Tom Arkoosh
C. Tom Arkoosh
tom.arkoosh@arkoosh.com
Attorney for Plaintiff

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 7th day of , I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

I HEREBY ALSO CERTIFY that on such date I served the foregoing on the following parties or counsel to be served via first class mail, postage prepaid, addressed as follows:

| | |
|---|---|
| Wendy J. Olson | Loretta E. Lynch |
| United States Attorney for the District of Idaho | Attorney General of the United States |
| Washington Group IV | U.S. Department of Justice |
| 800 Park Blvd., Suite 600 | 950 Pennsylvania Avenue, NW |
| Boise, ID 83712 | Washington, DC 20530-0001 |

/s/ C. Tom Arkoosh
C. Tom Arkoosh

COMPLAINT - 26